**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


GROUPE SEB USA, INC,      )
      )
      Plaintiff,      )
      )
      v.      )      Civil Action No. 14-137
      )      United States Magistrate Judge
EURO-PRO OPERATING LLC,      )      Cynthia Reed Eddy[1]
      )
      Defendant.      )

**MEMORANDUM OPINION**

Before the Court is Plaintiff Groupe SEB USA, Inc.'s Motion for Preliminary Injunction against Defendant Euro-Pro Operating LLC pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law unfair competition under Pennsylvania law. (ECF No. 3). Plaintiff seeks to enjoin Defendant until final hearing from engaging in false advertising and unfair competition, making any statements or claims regarding the alleged false statements, selling any of its packages which contain the alleged false statements, and a temporary recall of all products that contain the alleged false statements. For the reasons that follow, Plaintiff's Motion for preliminary injunction will be granted.

## I.    Procedural History

On January 29, 2014, Plaintiff filed a complaint with this Court. (ECF No. 1). The following day, on January 30, 2014, Plaintiff filed a Motion for Preliminary Injunction. (ECF No. 3). Defendant filed a brief in response to said motion on February 26, 2014. (ECF No. 21). A day-long hearing on the motion was held on March 19, 2014 during which evidence was

---

[1] By consent of the parties, (ECF Nos. 14, 16), pursuant to 28 U.S.C. § 636(c), the undersigned has full "authority over dispositive motions…and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003); *In re Search of Scranton Hous. Auth.*, 487 F.Supp.2d 530, 535 (M.D.Pa. 2007).

admitted and testimony from several witnesses was presented.  Tr. Vol. I (ECF No. 50); Tr. Vol II. (ECF No. 46); Minute Entry filed on March 20, 2014 (ECF No. 40).

The Court heard testimony from the following witnesses: (1) Marcel Klose (test engineer at independent laboratory)[2]; (2) Clemens Auth (Plaintiff's head of quality laboratory); (3) Scott Pollard (Plaintiff's marketing director); (4) Abid Kemal (Defendant's expert in scientific testing and mechanical engineering); (5) Jennifer McCabe (Defendant's general counsel); (6) David Stephens (Defendant's senior director of sales and trade marketing); and (7) Gary Ford (Defendant's marketing expert).  Following the hearing, the parties were ordered to attend mediation, however, despite good-faith efforts by all parties, the parties were unable to settle the dispute.  (ECF No. 42).  The parties were also ordered to file supplemental proposed findings of fact and conclusions of law, which were received on April 16, 2014.  (ECF Nos. 47, 48).  In determining that a preliminary injunction should be granted, the Court has considered all of the evidence introduced at the evidentiary hearing, the declarations of the witnesses, the affidavits of record, the arguments made in the parties' briefs as well as at the hearing, and the supplemental proposed findings of fact and conclusions of law.

## II.    Findings of Fact

Plaintiff Groupe SEB USA, Inc. distributes and sells various branded small household appliances, including cookware, kitchen electrics, and domestic care products throughout the United States.  At issue in this case are two models of Plaintiff's steam irons that are sold under the brand name Rowenta, which is the number one selling brand of steam irons in the United States (measured by dollar value of sales).[3]  Defendant Euro-Pro is a leading manufacturer, marketer, and distributer of various household appliances, including steam mops, vacuums, and

---

[2]  Marcel Klose testified from Germany via video conferencing.  Tr Vol. I (ECF No. 50), at 5.  Mr. Klose testified with the assistance of an interpreter, who was present in the courtroom.  *Id.*
[3]  Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 5.

small kitchen and household appliances.[4]  Two models of Defendant's Shark brand steam irons are at issue in this action.

In mid-October 2013, Plaintiff became aware that Defendant was selling new models of Shark brand steam irons at brick and mortar retail stores.[5]  Specifically, Plaintiff became aware that Shark Professional Steam Irons, Model GI405-55 ("Shark 405"), and Shark Ultimate Professional Steam Irons, Model GI505-55 ("Shark 505") contain statements on their packaging and hang tags making comparisons to the Rowenta Focus, Model No. DW5080 ("Rowenta DW5080"), and the Rowenta Steamium, Model No. DW9080 ("Rowenta DW9080").[6]  The Shark 405 contains the statement "MORE POWERFUL STEAM vs. Rowenta[®††] at half the price" on the front of the packaging in the bottom right corner.[7]  The bottom of the package contains a disclaimer in fine print that states, "††Based on independent comparative steam burst testing to Rowenta DW5080 (grams/shot)."[8]  The front of the packaging also contains a statement in the top right corner that says "#1 MOST POWERFUL STEAM[*]."[9]  There is a disclaimer regarding this statement on the bottom of the package in fine print that states, "*Offers more grams per minute (maximum steam setting while bursting before water spots appear) when compared to leading competition in the same price range, at time of printing."[10]

The packaging of the Shark 505 contains essentially the same statements on the front of its packaging: "MORE POWERFUL STEAM vs. Rowenta[®†] at half the price" in the bottom

---

[4]  Stephens Supplemental Dec. (Defendant's Exhibit 33), at ¶ 6.
[5]  Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 8.
[6]  *Id.* at ¶¶ 8, 10; Tr. Vol. I (ECF No. 50), at 53-54 (Pollard).  Defendant also offers for sale in Wal-Mart stores the Shark 505 under the Model No. GI505-55WM, which is functionally the same as Model No. GI505-55.  Joint Stipulations (ECF No. 39), at Sec. A, ¶ 2.  Therefore, both models will be referred to collectively as "Shark 505."
[7]  Shark 405 (Plaintiff's Exhibit 2); Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 12; Photographs from Kohl's in January 2014 (Plaintiff's Exhibit 17b).
[8]  Shark 405 (Plaintiff's Exhibit 2); Pollard. Dec. (Plaintiff's Exhibit 21), at ¶ 12.
[9]  *Id*.
[10]  *Id*.

right corner and "#1 MOST POWERFUL STEAM[*]" in the upper right corner on the front of the packaging.[11] Regarding the "MORE POWERFUL STEAM vs. Rowenta[®†] at half the price" statement, the bottom of the packaging contains a disclaimer stating "†Based on independent comparative steam burst testing to Rowenta DW9080 (grams/shot)."[12] There is also a disclaimer on the bottom of the packaging in fine print for the "#1 MOST POWERFUL STEAM*" statement which reads, "*Offers more grams per minute (extended steam burst mode before water spots appear) when compared to leading competition in the same price range, at time of printing."[13]

Additionally, both the Shark 405 and Shark 505 have hang tags, which are attached to the product on store displays and also packaged inside the box with the product.[14] Both hang tags contain the statement that the Shark model has "MORE POWERFUL STEAM vs. Rowenta[®†] at half the price."[15] Likewise, underneath both statements, on the same side of the hang tag, there is a disclaimer that states "based on independent comparative steam burst testing" to the respective Rowenta model in "(grams/shot)."[16]

Plaintiff's Rowenta DW5080 and DW9080 and Defendant's Shark 405 and Shark 505 can be purchased either online or in retail stores.[17] In this judicial district and throughout the United States, Rowenta steam irons are sold alongside Shark steam irons.[18] Although the Rowenta DW5080 and DW9080 are in different price ranges than the Shark 405 and Shark 505,

---

[11]  Shark 505 (Plaintiff's Exhibit 1); Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 11.
[12]  *Id.*
[13]  *Id.*
[14]  DeWick Affidavit (Plaintiff's Exhibit 23), at 20; Tr. Vol. I (ECF No. 50), at 57, 58 (S. Pollard).
[15]  *Id.*  The Shark 405 has "[††]" next to the Rowenta name and the Shark 505 has "[†]" next to the Rowenta name in the "MORE POWERFUL STEAM vs. Rowenta[®]" statement.  For purposes of consistency, when the Court references this statement  as pertaining to both the Shark 405 and Shark 505, it will use "[†]" next to the Rowenta name.
[16]  *Id.*
[17]  Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 15; Joint Stipulations (ECF No. 39), at Sec. A., ¶¶ 6, 7.
[18]  Pollard Dec. (Plaintiff's Exhibit 21), at ¶¶ 14, 15.

respectively, the two brands compete with each other because they are sold online and in retail stores in the same spaces, sometimes next to each other.[19] Moreover, the fact that Defendant chose to specifically compare its Shark models to the Rowenta models on the front of the packages demonstrates that the two brands are competitors.

Once Plaintiff discovered that the Shark 405 and Shark 505 contain the above statements on the packaging and hang tags in October 2013, Plaintiff conducted internal testing at its lab in Germany.[20] The German laboratory conducted steam performance tests comparing five steam irons, including the Shark 505 and the Rowenta DW9080.[21] The tests performed by the laboratory measured (1) the variable steam rate in grams per minute (grams/minute) according to International Electrical Corporation ("IEC") 60311 protocol for each steam iron and (2) the mass of a shot of steam of each iron in grams per shot (grams/shot) according to IEC 60311 protocol for each steam iron.[22] The IEC is a non-profit, non-governmental international standards organization that prepares and publishes international standards for all electrical, electronic and related technologies, collectively known as "electrotechnology." The IEC is the world's leading international organization in its field, and its standards are adopted as national standards by its members.[23] Among the international standards that the IEC has prepared and published are

---

[19] Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 14; Tr. Vol. I (ECF No. 50), at 57-58 (Pollard).

[20] Tr. Vol. I at 34 (Auth). In 2010, Plaintiff became aware that previous Shark models contained statements about Rowenta models, including the DW9080. Id. at 32-33. As a result, Plaintiff performed internal testing at its German laboratory, where it concluded that the statements on the Shark models were false. Id.; Auth Dec. (Plaintiff's Exhibit 20), at ¶ 15. Plaintiff transmitted its findings to Defendant on February 14, 2011. (Plaintiff's Exhibit 6). However, no further action was taken. The Court finds that this prior dispute involving previous Shark models that made claims about certain Rowenta models is irrelevant to this action.

[21] Auth Dec. (Plaintiff's Exhibit 20), at ¶ 19.

[22] Id. at ¶ 20.

[23] IEC International Standard 60311 (Plaintiff's Exhibit 9); Klose Dec. (Plaintiff's Exhibit 22), at ¶¶ 10, 11.

standards for steam iron testing. Specifically, the IEC's protocol for steam iron testing is IEC 60311.[24]

The results of the variable steam measurement test according to IEC 60311 protocol in terms of grams per minute show that the Rowenta DW9080 and Shark 505 had the same performance, with each measuring 37 grams per minute.[25] The results of the mass of a shot of steam test according to IEC 60311 in terms of grams per shot showed that the Rowenta DW9080 outperformed the Shark 505, measuring 1.34 grams per shot and 1.00 grams per shot, respectively.[26]

As a result of the findings in its internal tests, Plaintiff sought independent testing to determine whether the claims made on the Shark 405 and Shark 505 were false.[27] On or about November 4, 2013, Plaintiff requested that SLG Prüf- und Zertifizierungs GmbH ("SLG"), an independent laboratory located in Hartmannsdorf, Germany, conduct tests in accordance with IEC 60311 protocol with respect to the Rowenta DW9080, Rowenta DW5080, Shark Lightweight Professional Steam Iron, Model GI305-55 ("Shark 305"), Shark 405, and Shark 505.[28] SLG prepared a thirty-eight page report titled Prüfbericht/ Test Report 1297-13-WW-13-PB002 ("SLG Test Report") after conducting the various tests, which was transmitted to Plaintiff on December 5, 2013.[29]

The SLG Test Report shows that the Rowenta DW5080 had better steaming rate performance results than the Shark 405 in terms of grams per minute in accordance with IEC

---

[24] Tr. Vol. I (ECF No. 50), at 36, 37 (C. Auth); IEC International Standard 60311 (Plaintiff's Exhibit 9).
[25] Auth Dec. (Plaintiff's Exhibit 20), at ¶ 22; Groupe SEB Test Report from October 2013 (Plaintiff's Exhibit 7).
[26] Auth Dec. (Plaintiff's Exhibit 20), at ¶ 23; Groupe SEB Test Report from October 2013 (Plaintiff's Exhibit 7).
[27] Auth Dec. (Plaintiff's Exhibit 20), at ¶ 26.
[28] *Id.* at ¶¶ 27, 28.
[29] SLG Test Report (Plaintiff's Exhibit 8); Auth Dec. (Plaintiff's Exhibit 20), at ¶ 29; Klose Dec. (Plaintiff's Exhibit 22), at ¶¶ 13, 14.

60311.[30]   Additionally, said report shows that the Rowenta DW9080 had better steaming rate performance than the Shark 505 in terms of grams per minute in accordance with IEC 60311.[31] SLG also tested the mass of a shot of steam in accordance with both IEC 60311 and the Shark's user manual in terms of grams per shot, which is the test specified in the disclaimers on the packaging of the Shark 405 and Shark 505 with respect to the "MORE POWERFUL STEAM vs. Rowenta[®†] at half the price" statement.   Regarding this measurement, the results of the SLG Test Report show that the Rowenta DW5080 outperformed the Shark 405 overall, and the Rowenta DW9080 outperformed the Shark 505 overall.[32]

---

[30]  Klose Dec. (Plaintiff's Exhibit 22), at ¶ 37; SLG Test Report (Plaintiff's Exhibit 8), at 4, 6.  The three Rowenta DW5080 steam irons produced averages of 33.7, 35.0, and 35.4 grams per minute while the three Shark 405 steam irons produced averages of 26.3, 23.4, and 20.6 grams per minute.  *Id.*

[31]  Klose Dec. (Plaintiff's Exhibit 22), at ¶ 36; SLG Test Report (Plaintiff's Exhibit 8), at 3, 7.  The three Rowenta DW9080 steam irons produced averages of 34.7, 34.1 and 34.4 grams of steam per minute while the three Shark 505 steam irons produced averages of 28.9, 28.2, and 28.5 grams per minute.

[32]  Klose Dec. (Plaintiff's Exhibit 22), at ¶¶ 38-41; SLG Test Report (Exhibit 8).  In accordance with IEC 60311, the three Rowenta DW5080 steam irons produced averages of 1.30, 1.25, and 1.07 grams per shot of steam per device and the Shark 405 steam irons produced averages of 1.49, 0.96, and 1.02 grams per shot of steam per device.  SLG Test Report (Plaintiff's Exhibit 8), at 9, 11.  Thus, one of the Shark 405 steam irons performed better than all three of the Rowenta DW5080 steam irons and two of the Shark 405 steam irons performed worse than all three of the Rowenta DW5080 steam irons.  *Id.*; Klose Dec. (Plaintiff's Exhibit 22), at ¶ 39.  The Shark 405 had a slightly greater combined average of 1.217 grams per shot compared to the Rowenta DW5080's combined average of 1.207 grams per shot. With regard to the Rowenta DW9080 and Shark 505 and in accordance with IEC 60311, the Rowenta DW9080 steam irons produced averages of 0.94, 1.72, and 1.83 grams per shot of steam per device and the Shark 505 steam irons produced averages of 1.30, 1.16, and 1.31 grams per shot of steam per device.  SLG Test Report (Plaintiff's Exhibit 8), at 8, 12.  Therefore, two of the three Rowenta DW9080 steam irons produced more steam in grams per shot than the three Shark 505 steam irons tested and one Rowenta DW9080 performed worse than all three of the Shark 505 steam irons tested.  *Id.*; Klose Dec. (Plaintiff's Exhibit 22), at ¶ 8, 12. The Rowenta DW9080 had a greater combined average 1.497 grams per shot compared to the Shark 505's combined average of 1.257 grams per shot.

Additionally, the SLG Test Report demonstrates that in accordance with the Shark's user manual, the Rowenta DW5080 steam irons produced averages of 1.20, 1.23, and 1.05 grams per shot of steam per device and the Shark 405 steam irons produced averages of 1.45, 1.00, and 0.90 grams per shot of steam per device.  SLG Test Report (Plaintiff's Exhibit 8), at 14, 16.  Thus, one of the Shark 405 steam irons outperformed all three of the Rowenta DW5080 steam irons and two of the Shark 405 steam irons performed worse than all three of the Rowenta DW5080 steam irons.  *Id.*; Klose Dec. (Plaintiff's Exhibit 22), at ¶ 41.  The Rowenta DW5080 had a greater combined average of 1.16 grams per shot compared to the Shark 405's combined average of 1.117 grams per shot.  In accordance with the Shark's user manual, the Rowenta DW9080 steam irons produced 0.96, 1.59, and 1.68 grams per shot of steam per device and

The SLG Test Report was completed by Annett Monden, who was unable to testify at the hearing due to personal health reasons.[33] Thus, Plaintiff introduced the test through Ms. Monden's colleague, Marcel Klose, who stated that he did not participate in the test, but was familiar with the procedures used by Ms. Monden.[34] During his testimony, Mr. Klose was accompanied by Frank Rebhan, who is listed on the SLG Test Report as "Head of department consumer product testing," and who Mr. Klose described as his "superior."[35] The SLG Test Report was reviewed by Mr. Rebhan as well.[36]

At the hearing, Defendant's counsel raised concerns about the accuracy of the report's translation.[37] Plaintiff's counsel responded that she had a certified translation of the German version of the SLG Report, which would be provided to Defendant's counsel.[38] Since the hearing, Defendant's counsel has not identified any errors or discrepancies that occurred in translating the report from German to English.

"It is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). The Court finds that Mr. Klose was knowledgeable and familiar with the tests conducted by Ms. Monden, and was an appropriate

---

the Shark 505 steam irons produced 1.23, 1.16, and 1.42 grams per shot of steam per device. SLG Test Report (Plaintiff's Exhibit 8), at 13, 17. Thus, one Rowenta DW9080 performed worse than all three Shark 505 steam irons and two Rowenta DW9080 steam irons performed better than all three Shark 505 steam irons. *Id.*; Klose Dec. (Plaintiff's Exhibit 22), at ¶ 40.
The Rowenta DW9080 had greater combined average of 1.41 grams per shot compared to Shark 505's combined average of 1.27 grams per shot.

[33] Tr. Vol. I (ECF No. 50), at 12-14 (Klose); SLG Test Report (Plaintiff's Exhibit 8).

[34] Tr. Vol. I (ECF No. 50), at 12, 13 (Klose).

[35] Tr. Vol. I (ECF No. 50), at 11 (Klose); SLG Test Report (Plaintiff's Exhibit 8).

[36] Tr. Vol. I (ECF No. 50), at 11 (Klose).

[37] *Id.* at 7-8.

[38] *Id.* at 8.

witness to introduce the SLG Test Report. This finding is informed by Defendant's expert in scientific testing and mechanical engineering, Dr. Kemal, who testified that "SLG is another lab whose data I would normally rely on."[39]

Notably, Dr. Kemal concluded in his own independent testing that the Shark 405 and Shark 505 steam irons were "comparable" to the Rowenta DW5080 and DW9080 steam irons, respectively, with regard to his portion of the "burst mode" testing, which measured the mass of a shot of steam in grams per shot.[40] Dr. Kemal concluded that he could not "say for sure that one was always operating better than the other."[41] Dr. Kemal also testified that Defendant never provided him with an independent comparative steam burst test on this particular measurement, and the Court notes that no such testing was introduced at the hearing. Thus, the Court finds that the "independent comparative steam burst testing" measured in "(grams/shot)" referred to in the disclaimers to the "MORE POWERFUL STEAM vs. Rowenta®† at half the price" on the Shark 405 and Shark 505 steam irons does not exist.

## III.    Preliminary Injunction Standard

Preliminary injunctive relief is "a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed.Cir.1993); *see also Hoxworth v. Blinder, Robinson & Company. Inc.*, 903 F.2d 186, 189 (3d Cir.1990). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last peaceable, noncontested status of the parties." *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Opticians Ass'n of Am. V. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). Where the requested preliminary injunction "is directed not

---

[39] Tr. Vol. II (ECF No. 46), at 59 (Kemal).
[40] Kemal Supplemental Dec. (Defendant's Exhibit 32), at ¶ 18; Tr. Vol. II (ECF No. 46), at 74, 74 (Kemal).
[41] Tr. Vol. II (ECF No. 46), at 75-76 (Kemal).

merely at preserving the status quo but . . . at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir.1980); *see also Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994). Indeed, "[m]andatory injunctions should be used sparingly," and only when the status quo is one of action that will inflict irreparable injury on the movant. *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982).

For a court to issue a preliminary injunction, a plaintiff must prove the following four elements: "(1) a likelihood of success on the merits; (2) [it] will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). A preliminary injunction may be based on facts presented at a hearing, or through affidavits, deposition testimony, or other documents. *See, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000); *Karakozova v. Univ. of Pittsburgh*, 2009 WL 3151810, at *2 (W.D. Pa. 2009). The Court will address each element in turn.

**A.      Likelihood of Success on the Merits**

As explained above, Plaintiff bears the burden of establishing a likelihood of success on the merits. "[O]n an application for preliminary injunction, the plaintiff need only prove a prima facie case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), forbids the use in commerce of any "false or misleading representation of fact which . . . misrepresents the nature, characteristics, [or] qualities . . . of another person's goods, services, or

commercial activities." In order to establish a false advertising claim under the Lanham Act in the Third Circuit, a plaintiff must prove:

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (quoting *Warner–Lambert v. Breathasure*, 204 F.3d 87, 91-92 (3d Cir. 2000)). "A Pennsylvania common law cause for unfair competition is identical to the Lanham Act, without the federal requirement of interstate commerce." *R.J. Ants, Inc. v. Marinelli Enterprises, LLC*, 771 F. Supp. 2d, 475, 489 (E.D. Pa. 2011) (citations omitted).

A plaintiff may establish a false advertising claim under the Lanham Act if it proves that (1) the statement is literally false, or (2) the statement is literally true but misleading to the consumer. *Highmark*, 276 F.3d at 171 (citing *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993)). "If an advertisement is literally false, the plaintiff does not have to prove actual consumer deception." *Id.* Here, Plaintiff has only alleged literal falsity.

"If a defendant's claim is untrue, it must be deemed literally false." *Castrol,* 987 F.2d at 943-944. "A determination of literal falsity rests on an analysis of the message in context." *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129 (3d Cir. 1994). The Court "is not bound by strictly formal interpretations" of the challenged advertisement. *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, at 606 (D.N.J. 2003). A literally false message can be conveyed either explicitly or implicitly, however, "only an *unambiguous* message can be

literally false." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586-587 (3d Cir. 2002). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported." *Id.* (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir.1998)).

Defendant contends that the "MORE POWERFUL STEAM vs. Rowenta®† at half the price" statement that is on the front packaging of the Shark 405 and Shark 505 is ambiguous because "power" can be "defined in a multitude of ways."[42] Defendant emphatically argued this position at the hearing, securing testimony from an expert in scientific testing and mechanical engineering as well as an expert in marketing to support this notion. This argument fails, however, because Defendant specified the test for power via the disclaimer on the packaging and hang tags of its products. On the Shark 405, the disclaimer states "††Based on independent comparative steam burst testing to Rowenta DW5080 (grams/shot)." On the Shark 505, the disclaimer states "†Based on independent comparative steam burst testing to Rowenta DW9080 (grams/shot)." Therefore, the Court finds that the claim "MORE POWERFUL STEAM vs. Rowenta®† at half the price" is unambiguous, and that Defendant's assertion that "power" carries a different meaning than what is defined on its packaging is without merit.

The Court also finds that the statement "MORE POWERFUL STEAM vs. Rowenta®† at half the price" is untrue. The SLG Test Report establishes that in accordance with IEC 60311 and the Shark user manual, the Shark 405 did not have more powerful steam than the Rowenta

---

[42] Defendant's Brief (ECF No. 21), at 9. The Rowenta DW5080 and DW9080 are both more expensive than the Shark 405 and Shark 505. Pollard Dec. (Plaintiff's Exhibit 21), at ¶ 14. Plaintiff does not contest that the Shark 405 is half the price of the Rowenta DW5080 or that the Shark 505 is half the price of the Rowenta DW9080. *See* Joint Stipulations (ECF No. 39), at Sec. A., ¶ 5. Thus, Plaintiff only challenges the "more powerful steam" portion of the statement, together with the disclaimer identifying the specific Rowenta model based on independent testing in grams/shot.

DW5080 based on grams per shot, and the Shark 505 did not have more powerful steam than the Rowenta DW9080 based on grams per shot. Moreover, Dr. Kemal, Defendant's expert in scientific testing and mechanical engineering, testified that based upon his own tests as well as the SLG Test Report relating to the mass-based portion of testing, the Shark 405 and Shark 505 steam irons were *comparable* to the Rowenta DW5080 and DW9080 steams irons.[43] Dr. Kemal concluded that "there was not enough statistical confidence to be able to say for sure that one was always operating better than the other."[44] Thus, Defendant provided no evidence that the Shark 405 and Shark 505 have "more powerful steam" than the Roewnta DW5080 and DW9080, respectively. Additionally, Defendant's disclaimers provide that said statement is "based on independent comparative steam burst testing" measured in grams per shot. However, Defendant never produced any such independent comparative steam burst tests to either the Court or its expert, Dr. Kemal.[45] *See Novartis*, 290 F.3d at 590 ("a court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect.")

Therefore, the Court finds that the statement on the packaging of the Shark 405 that it has "MORE POWERFUL STEAM vs. Rowenta[®††] at half the price," "††Based on independent comparative steam burst testing to Rowenta DW5080 (grams/shot)" is literally false. The Court also finds that the statement on the packaging of the Shark 505 that it has "MORE POWERFUL STEAM vs. Rowenta[®†] at half the price," "†Based on independent comparative steam burst testing to Rowenta DW9080 (grams/shot)" is literally false. Likewise, said statements as they appear on the hang tags of the Shark 405 and Shark 505 are literally false.

---

[43] Tr. Vol. II (ECF No 46), at 74, 75 (Kemal); *see also* Kemal Supplemental Dec. (Defendant's Exhibit 32), at ¶ 18.
[44] Tr. Vol. II (ECF No. 46), at 75 (Kemal)
[45] *Id.* at 75-76.

Plaintiff also asserts that the statement "#1 MOST POWERFUL STEAM[*]" on the front of the Shark 405 and Shark 505 packaging is literally false, when considering the packaging in its entirety, because the statement is in juxtaposition to the Rowenta name, necessarily implying a direct comparison to Rowenta.[46] The Court agrees with Plaintiff. A literally false statement may be "'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Novartis*, 290 F.3d at 586-587. The Court recognizes that there is a disclaimer for this statement on the bottom of the box that states "*Offers more grams per minute (maximum steam setting while bursting before water spots appear) when compared to leading competition in the same price range, at time of printing," and that Rowenta and Shark are not in the same price range. However, the statement "#1 MOST POWERFUL STEAM" that appears directly above the literally false statement "MORE POWERFUL STEAM vs. Rowenta" will "necessarily and unavoidably be received by the consumer" as an assertion that the Shark steam irons are superior to the Rowenta steam irons. *See Novartis*, 290 F.3d at 588.

Consequently, Plaintiff has provided sufficient evidence to establish that the statements "MORE POWERFUL STEAM vs. Rowenta[®†] at half the price" on the packaging and hang tags of the Shark 405 and Shark 505 as well as "#1 MOST POWERFUL STEAM[*]" statement on the packaging of the Shark 405 and Shark 505, when considering the accompanying disclaimers, are literally false.

Plaintiff has also demonstrated that said statements are material. The materiality inquiry focuses on whether the defendant's claims are likely to influence consumers' purchasing decisions. *See, e.g., Dentsply Int'l, Inc. v. Great White, Inc*., 132 F. Supp. 2d 310, 325 (M.D. Pa. 2000). Defendant does not dispute that its advertising claims concerning steam output are

---

[46] Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law (ECF No. 47), at ¶ 122.

material and likely to influence consumers' purchasing decisions. Indeed, both companies sell steam irons and the claims involve more powerful steam than the competitor and most powerful steam overall. Clearly the marketing strategy was intended to induce consumers to purchase Defendant's product over Plaintiff's product, especially considering that the two often appear next to one another on the shelves at retail stores and the Shark mentions Roewenta by name.

Plaintiff has established that the Shark 405 and Shark 505 travel in interstate commerce. The products are sold both on the internet and nationwide through retail stores such as Best Buy, Target, Wal-Mart, and Kohl's.[47] Defendant does not challenge that its products travel in interstate commerce.

Plaintiff has also established the last element of a false advertising claim that there is a likelihood of injury to it "in terms of declining sales, loss of good will, etc." The Court finds that Defendant's literally false statements on the packaging and hang tags of the Shark 405 and Shark 505 are likely to cause consumers to choose the Shark irons over the Rowenta DW5080 and DW9080 models, which will also affect Plaintiff's relationships with the retailers that sell its products. Defendant's literally false statements about its steam power compared to Plaintiff's steam power are likely to have a negative impact on its brand, reputation, and goodwill.

Therefore, Plaintiff has established a likelihood of success on the merits with respect to its false advertising claim pursuant to the Section 43(a) of the Lanham Act as well as its claim regarding common law unfair competition under Pennsylvania law.

**B.    Irreparable Injury**

Given that it has been determined that Plaintiff is likely to succeed on the merits, it is necessary to address whether Plaintiff is entitled to a presumption of irreparable injury. In 2004,

---

[47] Pollard Dec. (Plaintiff's Exhibit 21), at ¶¶ 7-8; DeWick Affidavit (Plaintiff's Exhibit 23), at ¶¶ 7-9, 15, 18-19.

the Third Circuit held in *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) that the plaintiff was entitled to a presumption of irreparable harm because the plaintiff had shown a likelihood of success on the merits. However, the Supreme Court of the United States subsequently held in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-393 (2006), a patent infringement case, that patent plaintiffs are not entitled to a presumption of irreparable injury despite a showing of likelihood of success on the merits. The Court in *eBay* stated that it has "long recognized" that "'a major departure from the long tradition of equity practice should not lightly be implied." *Id.* at 391. In finding that "[n]othing in the Patent Act indicates that Congress intended such a departure," the Court pointed to the language of the Patent Act that "expressly provides that injunctions 'may' issue 'in accordance with the principles of equity.'" *Id.* In its conclusion, the Court stated that "we hold only that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised with traditional principles of equity, in patent disputes *no less than in other cases governed by such standards*." *Id.* at 394. (emphasis added).

Like the Patent Act, Section 34 of the Lanham Act, 15 U.S.C. § 1116, provides that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have the power to grant injunctions, *according to the principles of equity and upon such terms as the court may deem reasonable*, to prevent . . . a violation under subsection (a) . . . of Section 1125 of this title." 15 U.S.C. § 1116(a) (emphasis added). In *American Beverage Corp. v. Diageo North American, Inc.*, 936 F.Supp.2d 555 (W.D. Pa. 2013), Chief Judge Conti compared the Copyright Act to the Lanham Act in light of *eBay* and its subsequent interpretations. Judge Conti concluded that "the broad language in the Lanham Act evidences no congressional attempt

to depart from traditional equitable principles in permitting injunctive relief." *Id.* at 613-614. This Court agrees with Judge Conti's analysis.

Furthermore, in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21 (2008), the Supreme Court found that the lower courts erred by concluding "that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." The Court in *Winter* held that the "possibility" standard is too lenient, explaining that "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 21. Therefore, although the Third Circuit held in *Kos Pharmaceuticals* that a court may find a presumption of irreparable injury if a likelihood of success on the merits is proved, the Supreme Court's later decisions in *eBay* and *Winter* as well as Judge Conti's decision in *American Beverage Corp.* indicate that such a presumption no longer exists in the Lanham Act context. Consequently, Plaintiff bears the burden of showing that it is likely to suffer irreparable harm in the absence of preliminary injunctive relief.

Plaintiff argues that Defendant's comparative advertising campaign has caused a decline in sales of its Rowenta steam irons in the range of fifteen to forty-six percent in Target retail stores.[48] However, at the hearing, Plaintiff failed to establish a causal connection between the declining Rowenta sales at Target retail stores and the Shark's comparative advertising. Plaintiff's marketing director, Scott Pollard, testified during cross-examination that the Rowenta DW5080 and DW9080 are not sold at the Target retail stores.[49] Mr. Pollard also testified that the decline in sales regarding the Rowenta DW5080 occurred before October 2013, the time when Plaintiff asserts that the Shark 405 and Shark 505 began appearing at retail stores for

---

[48] Plaintiff's Proposed Supplemental Findings of Fact and Conclusions of Law (ECF No. 47), at ¶¶ 78, 79.
[49] Tr. Vol. II (ECF No. 46), at 12 (Pollard).

customer purchase.[50]  Additionally, Mr. Pollard testified that the decrease in sales regarding the Rowenta DW9080 was attributed to discontinuing that specific model, and replacing it with the DW9280 model.[51]

Plaintiff has failed to show irreparable injury through declining sales at Target retail stores, however, "[i]rreparable injury does not require diversion of actual sales." *W.L. Gore & Assoc., Inc. v. Totes Inc.*, 788 F.Supp. 800, 810 (D. Del. 1992).  Plaintiff has convincingly demonstrated that it is likely to suffer loss of control of reputation, loss of trade, and loss of goodwill, which are "[g]rounds for finding irreparable injury."  *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990).  "Irreparable harm 'must be of a peculiar nature so that compensation in money alone cannot atone for it.'"  *Id.* (quoting *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987).  "To prove irreparable injury under § 43(a), [a plaintiff] need only provide 'a reasonable basis for the belief that . . . [it] is likely to be damaged as a result of the false advertising.'"  *Totes*, 788 F.Supp. at 810 (quoting *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. 1209, 1224 (D. Del. 1986)).

Plaintiff presented credible testimony that it has strong relationships with both its customers as well as the retailers that sell its products.[52]  Additionally, Plaintiff established that the Rowenta steam irons and the Shark steam irons compete against one another and are frequently sold next to each other on retail shelves.  This is further demonstrated by the very fact that the Shark brand chose to specifically identify Rowenta on its packaging in an attempt to divert sales from Plaintiff.  It has also been established that steam power is an important factor for consumers in the market for a steam iron.[53]  In fact, if steam power was not an important

---

[50]  *Id.* at 13.
[51]  *Id.* at 12-13.
[52]  Tr. Vol. I (ECF No. 50), at 72 (Pollard).
[53]  Tr. Vol. II (ECF No. 46), at 6 (Pollard).

18

factor for consumers, Shark would not have chosen to dedicate such a substantial portion of its packaging touting its powerful steam.

In choosing to market its steam power, Defendant made literally false statements about its competitor. The literally false claims are likely to cause both prospective customers and current customers to believe that the much lower-priced Shark 405 and Shark 505 steam irons offer better performance than the Rowenta DW5080 and Rowenta DW9080 steam irons. Prospective customers will be less likely to purchase the more expensive Rowenta DW5080 or DW9080 steam irons based on the statements contained on the packaging and hang tags of the Shark 405 and Shark 505 steam irons.[54] With regard to its current customers, Plaintiff's marketing expert, Scott Pollard, explained that there is a risk they will experience "buyer's remorse," questioning why they spent more money on a product that is more expensive and inferior than a competing brand.[55]

Plaintiff has also established that the literally false statements are likely to impact its relationships with the retailers that sell its products. Both parties stressed the importance of having strong relationships with the various retailers.[56] In fact, in arguing in opposition to a preliminary injunction, Defendant recognizes the difficulty in calculating a loss of reputation and goodwill, stating it "would be near impossible to calculate."[57] Defendant submits that a preliminary injunction "would tarnish the Shark brand and its recognized reputation for delivering outstanding, high performing products at a great value to customers."[58] However,

---

[54] Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law (ECF No. 47), at ¶ 84
[55] Tr. Vol. I (ECF No. 50), at 68 (Pollard).
[56] Pollard Dec. (Plaintiff's Exhibit 21), at ¶¶ 32-34; Stephens Supplemental Dec. (Defendant's Exhibit 30), ¶¶ 39.
[57] Stephens Supplemental Dec. (Defendant's Exhibit 33), at ¶ 40.
[58] *Id.* at ¶ 42.

Defendant chose to make literally false, unsubstantiated comparative claims that identify its competitor by name and are likely to tarnish the Rowenta brand name.

If Defendant is permitted to continue distributing its products that contain literally false statements on the packaging regarding Plaintiff's products, Plaintiff's goodwill and reputation to those retailers will necessarily diminish. Plaintiff spends millions of dollars annually in advertising, promotions and product development.[59] Defendant's literally false statements on the packaging of the Shark 405 and Shark 505 are likely to weaken Rowenta's brand and result in a loss of control of reputation, a loss of trade, and a loss of goodwill. *See Totes*, 788 F.Supp. at 811 ("this Court is convinced that a misleading comparison to a specific competing product necessarily diminishes the product value in the minds of the consumer").

In challenging that Plaintiff has not established irreparable injury, Defendant contends that Plaintiff exhibited excessive delay in bringing this lawsuit.[60] Defendant asserts that emergency relief is not warranted because the parties previously had a dispute in 2010 regarding similar packaging claims on earlier Shark steam iron models about particular Rowenta steam irons, including the DW9080. Plaintiff performed tests at its laboratory in Germany that found the claims on the packaging of the earlier Shark models were false and transmitted this information to Defendant in February 2011.[61] Defendant contends that in this case, "emergency relief is not warranted in light of the extended history between the parties concerning this line of advertising."[62] The Court finds this argument unpersuasive.

---

[59] Tr. Vol. I (ECF No. 50), at 67.

[60] Defendant's Supplemental Proposed Findings of *Fact* (ECF No. 47), at ¶¶ 93-98; Defendant's Supplemental Proposed Findings of *Law* (ECF No. 47), at ¶ 23.

[61] Tr. Vol. I (ECF No. 50), at 33 (Auth); Auth Dec. (Plaintiff's Exhibit 20), at ¶ 15; February 14, 2011 Letter and Tests Results (Plaintiff's Exhibit 6).

[62] Defendant's Supplemental Proposed Findings of *Fact* (ECF No. 47), at ¶ 98.

Although Defendant has been making similar claims about previous Shark models since at least 2010, said statements are not at issue before the Court. In this case, Plaintiff became aware of the statements made on the Shark 405 and Shark 505 in mid-October 2013, conducted internal testing at its laboratory in Germany, had independent follow-up testing performed by SLG, received the SLG Test Report on December 5, 2013, and brought this motion for preliminary injunction on January 30, 2014, the day after it filed its complaint. Under the circumstances, and based upon testimony from Plaintiff's marketing expert, Scott Pollard, and Plaintiff's head of quality laboratory, Clemens Auth, the Court finds that Plaintiff acted diligently in pursuing this claim. Moreover, Mr. Pollard testified that Plaintiff felt it was necessary to secure independent third party testing because Defendant's packaging stated that the claims were based on independent testing.[63] However, as the Court already noted, Defendant's claims were unsubstantiated and not supported by independent testing. Thus, Defendant contributed to the very delay of which it now complains. Moreover, the Court notes that Defendant has not shown that it has suffered prejudice as a result of the alleged delay. As a result, Plaintiff has demonstrated that it is likely to suffer irreparable injury if a preliminary injunction is not granted.

### C.    Balancing of Parties' Interests

The Court must determine whether granting injunctive relief to Plaintiff will result in greater harm to Defendant. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010). Defendant claims that an injunction will result in a loss of reputation and goodwill with retailers that cannot be calculated, and it will have a negative impact on the entire Shark brand, not just the steam irons sold under that name.[64] Defendant presented testimony through

---

[63] Tr. Vol. II (ECF No. 46), at 38 (Pollard).
[64] Stephens Supplemental Dec. (Defendant's Exhibit 33), at ¶ 40.

David Stephens, its senior director of sales and trade marketing, that a normal packaging recall would take at least 120 days.[65] Upon questioning by the Court, however, Mr. Stephens stated that if the Court were instead to order that the hang tag from the Shark 405 and Shark 505 be removed from the store displays and inside the packaging with the product, it "would not take a long time."[66] Mr. Stephens also acknowledged that "it would be faster" to place stickers over the statements on the Shark 405 and Shark 505 than to have a normal packaging recall of the product.[67]

The Court finds that the harm that is likely to be suffered by Defendant is outweighed by the harm that is likely to be suffered by Plaintiff if a preliminary injunction is not granted. Therefore, the Court finds that when considering Defendant's arguments and concerns, the most expeditious way to resolve this dispute is to order Defendant to remove the hang tags on the Shark 405 and Shark 505 that contain the statement "MORE POWERFUL STEAM vs. Rowenta®† at half the price" with the disclaimer stating, "based on independent comparative steam burst testing" to the respective Rowenta model in "(grams/shot)." Placing stickers over the statements "MORE POWERFUL STEAM vs. Rowenta®† at half the price" and "#1 MOST POWERFUL STEAM*" on the Shark 405 and Shark 505 steam irons will also be more expeditious than a normal packaging recall.

The Court recognizes Defendant's argument that a preliminary injunction could result in damage to its reputation and goodwill with its retailers and customers. However, the Court finds that any harm that Defendant suffers will be less than the harm Plaintiff will suffer if the preliminary injunction is not granted. Moreover, any loss that Defendant may suffer as a result

---

[65] Tr. Vol. II (ECF No. 46), at 103 (Stephens); Stephens Supplemental Dec. (Defendant's Exhibit 33), at ¶ 38.
[66] Tr. Vol. II (ECF No. 46), at 114 (Stephens).
[67] *Id.* at 108.

of its literally false statements would be self-imposed. "The injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis*, 290 F.3d at 596. Defendant placed literally false comparative statements on its packaging about a higher-priced competitor, knowing that the competing steam irons are often sold near or next to one another on store shelves. Defendant provided that its statements were "based on independent comparative steam burst testing," however, Defendant did not produce any such tests to its expert or the Court. As already noted, the independent comparative steam burst tests referenced in the disclaimers do not exist. Therefore, Plaintiff should not have to suffer the consequences of Defendant's literally false, unsubstantiated claims.

Defendant is concerned that in the time it takes to recall the literally false claims on the Shark 405 and Shark 505, it could lose shelf space at retail stores, which is very difficult to get back once lost.[68] The Court notes, however, that Defendant is still able to sell its other Shark model steam irons, including the 568, 435, and 468 models, while the Shark 405 and Shark 505 are temporarily recalled for stickering and removal of the hang tags.[69] Additionally, Defendant already sells the Shark 305 in many of the same retail stores that the Shark 405 is sold throughout the country, including Kohl's, Wal-Mart and Target retail stores.[70] Thus, Defendant is able to mitigate the potentially negative impact on the Shark brand, which the Court reminds Defendant is self-inflicted.

In conclusion, the Court finds that any harm likely to be suffered by Defendant is outweighed by the harm that Plaintiff is likely to suffer. The Court has attempted to mitigate Defendant's losses by ordering that the hang tags be removed and that stickers be placed over the

---

[68] Stephens Supplemental Dec. (Defendant's Exhibit 33), at ¶ 44; Tr. Vol. I (ECF No. 50), at 66 (Pollard).
[69] Tr. Vol. II (ECF No 46), at 116-117 (Stephens).
[70] *Id.* at 54 (Pollard), 114-115 (Stephens).

literally false statements, instead of ordering a normal packaging recall, which would take longer and cost more money. Additionally, Defendant can sell other models of Shark steam irons while the Shark 405 and Shark 505 are temporarily recalled, and can resume selling the Shark 405 and Shark 505 once the recall is complete.

### D. Public Interest

The last step in assessing whether to grant a preliminary injunction is a consideration of the public interest. "There is a strong public interest in the prevention of misleading advertisements." *Novartis*, 290 F.3d at 597 (quoting *American Home Products Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590 (S.D.N.Y. 1987). "The public has a right to information that will allow them to assess the quality of the product and to accurately price the product in accordance with their priorities and desires." *Totes*, 788 F.Supp at 813. "False advertising deprives the consumer of this information and deceives them into thinking they are buying a less expensive equivalent, a bargain on a quality product." *Id.* However, "[t]he public also has an interest in commercial competition and the resulting technological innovation and customer service." *Id.* at 813-814.

Here, the Court finds that the public interest is best served by issuance of a preliminary injunction. Defendant's literally false claims are likely to deceive and confuse the consuming public, which will not be alleviated absent an injunction. As long as Defendant sells the Shark 405 and Shark 505 steam irons with literally false statements on its packaging and hang tags, the consuming public will be misled and deceived with respect to the quality of goods which are available for purchase. Therefore, the public interest would best be served by granting Plaintiff's motion for preliminary injunction to ensure that the consuming public is able to make an informed decision based on accurate information.

## IV.    Requirement of a Bond

Federal Rule of Civil Procedure 65(c) requires that an applicant for a preliminary injunction give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   The amount of the bond is committed to the discretion of the trial court.  *Zambelli Fireworks Mfg. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988)); *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 394 (E.D. Pa. 2008).

Plaintiff contends that a bond of $1,000,000 is appropriate.[71]  Defendant's senior director for sales and trade marketing, Mr. Stephens, however, opined that a packaging recall alone would cost Defendant hundreds of thousands of dollars, and the preliminary injunction would cost Defendant between $2,000,000 and $4,000,000 total.[72]   The Court notes that it is not ordering a normal packaging recall that would require Defendant to replace the packaging of the Shark 405 and Shark 505 models.  Rather, the Court is ordering that Defendant remove its hang tags and place stickers over the literally false statements on the Shark 405 and Shark 505 packaging.  Mr. Stephens testified that removing the hang tags and stickering would take less time than having to repackage the products.[73]  Accordingly, the Court finds that removal of the hang tags and stickering will cost Defendant less money, especially when considering that new boxes do not need to be made.  Therefore, the Court finds that Plaintiff's proposed bond of $1,000,000 is appropriate under the circumstances when considering the cost of the recall itself as well as the potential resulting damages Defendant would incur if wrongly enjoined.

---

[71]  Tr. Vol. I (ECF No. 50), at 70 (Pollard).
[72]  Tr. Vol. II (ECF No. 46), at 109 (Stephens); Stephens Supplemental Dec (Defendant's Exhibit 33), at ¶ 37.
[73]  Tr. Vol. II (ECF No. 46), at 109, 114 (Stephens).

**V.    Conclusion**

Based on the foregoing, Plaintiff's Motion for Preliminary Injunction (ECF No. 3) is granted.    Defendant is enjoined from engaging in false advertising and unfair competition, making any statements or claims regarding the foregoing false statements, selling any of its packages which contain the foregoing false statements, and distributing and/or displaying hang tags that contain the foregoing false statements.    The Shark 405 and Shark 505 steam irons shall be temporarily recalled until their hang tags are removed and the literally false statements on the packaging are covered by stickers.    Plaintiff shall provide a security bond of $1,000,000 in accordance with Federal Rule of Civil Procedure 65(c).    An appropriate Order follows.

By the Court:

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc: all registered counsel via CM-ECF